**FILED**
**Dec 20, 2022**
**11:14 AM(ET)**
TENNESSEE COURT OF
WORKERS' COMPENSATION
CLAIMS



# TENNESSEE BUREAU OF WORKERS' COMPENSATION
## IN THE COURT OF WORKERS' COMPENSATION CLAIMS
### AT CHATTANOOGA

| | |
|---|---|
| Robert Goodman, <br>       Employee, <br><br> v. <br> BellSouth Telecommunications, LLC, <br>       Employer, <br> And <br> Old Republic Insurance Company, <br>       Carrier. | Docket No.: 2019-01-0820 <br><br><br> State File No.: 64335-2018 <br><br><br> Judge Audrey Headrick |

## COMPENSATION ORDER

Mr. Goodman requested benefits for injuries sustained by an electrical shock.[1] Although BellSouth did not dispute compensability, the parties raised several issues regarding medical and disability benefits. The parties disputed the proper physician to designate as the treating physician, and BellSouth continued to deny certain specialist referrals. The parties also disagreed as to the applicable permanent medical impairment rating and Mr. Goodman's entitlement to increased benefits or extraordinary relief. Further, the parties contested Mr. Goodman's motion for attorney fees after the Appeals Board's decision that BellSouth's appeal of a previous order was frivolous.

For the reasons below, the Court orders BellSouth to provide the requested benefits, but the request for increased benefits or extraordinary relief is premature. The Court holds that Dr. Jack Scariano remains the authorized treating physician and orders BellSouth to authorize his specialist referrals. The Court also holds that Mr. Goodman is entitled to additional temporary disability benefits and an original award of permanent partial disability benefits. Finally, the Court orders BellSouth to pay Mr. Goodman's attorney $4,900.00 in fees related to the frivolous appeal.

### History of Claim

---

[1] At the hearing, Mr. Goodman withdrew his claim for attorney fees and expenses for wrongful denial of benefits under Tennessee Code Annotated section 50-6-226(d)(1)(B) (2022).

On August 23, 2018, Mr. Goodman, a lineman technician, worked for BellSouth when he suffered a significant electrical shock. Co-workers who witnessed the shock transported him for emergency care. Due to his injury, the hospital transferred Mr. Goodman to another hospital capable of providing trauma care. After a referral, Mr. Goodman selected Dr. Scariano, a board-certified neurologist, from a panel.

Mr. Goodman first saw Dr. Scariano in October. He complained of having a brief loss of consciousness after his shock, difficulty walking and using his right arm, memory problems, persistent neck pain, and a constant headache. Dr. Scariano ordered various diagnostic tests and diagnosed right-arm complex regional pain syndrome, which he described as a nerve injury stemming from electrocution.

After testing, Dr. Scariano further diagnosed absence epileptic syndrome, headaches, and cramps and spasms due to his involuntary movements, but he ruled out a stroke or neck injury. He also referred Mr. Goodman for an audiology evaluation due to ringing in his ears and hearing loss.

Dr. Scariano then released Mr. Goodman to return to work with restrictions against climbing, getting into a bucket, or using his hands to move or lift more than ten pounds. He also stated Mr. Goodman "could never return to a true lineman job." BellSouth did not offer light duty for his job classification, and Mr. Goodman never returned to work for BellSouth.[2]

Later, Dr. Scariano said that testing confirmed Mr. Goodman's hearing loss, and he ordered hearing aids. The work restrictions remained in place.

On May 16, 2019, Dr. Scariano placed Mr. Goodman at maximum medical improvement but inexplicably assessed three different impairment ratings on the same day. In his office note, Dr. Scariano gave a ten-percent impairment rating. On a form supplied by BellSouth, Dr. Scariano assigned a five-percent impairment rating and a permanent restriction to avoid heights. He also completed a Final Medical Report and assessed a three-percent impairment. BellSouth requested clarification regarding the three ratings, and Dr. Scariano confirmed that Mr. Goodman retained a three-percent impairment for his headaches.

Over the next several months, Dr. Scariano referred Mr. Goodman to various specialists for treatment and testing, including neuropsychological testing at the Shepherd Center and testing for auditory and balance issues. He noted that central auditory testing suggested a "global deficit in auditory processing ability." Dr. Scariano also wrote that neuropsychologist Dr. Susan Shwartz with the Shepherd Center recommended speech

---

[2] Based on the holdings, the Court finds it unnecessary to summarize Mr. Goodman's testimony regarding difficulties he experienced with later employments.

2

therapy and outpatient psychotherapy, which he then ordered. In his deposition, Dr. Scariano described the Shepherd Center as "a world known rehab center" that treats "all types of neurological issues, [including] electrocution[.]" BellSouth denied the recommended treatment.

In January 2021, Dr. Scariano sent a letter to BellSouth revising his impairment rating and making additional referrals. Regarding impairment, Dr. Scariano assessed an eleven-percent impairment comprised of three percent for the headaches, five percent for the psychological impairment, and three percent for the hearing impairment assessed by Dr. Johnson.[3] As to referrals, Dr. Scariano referred Mr. Goodman for a work capacity test and a neuro-ophthalmologist evaluation for his diplopia (double vision). Further, he stated Mr. Goodman exhibited diplopia, vertigo, and a possible right-eye nerve injury from the electrical shock.

Dr. Scariano testified that the impairment rating revision was necessary, since Mr. Goodman's condition clinically worsened because he never received the recommended treatment.

On May 24, 2021, Dr. Scariano addressed Mr. Goodman's decline and inability to work. He stated Mr. Goodman exhibited a mental status decline as documented by the Shepherd Center and noted his "impairments from his original injury seems [sic] to be progressing." Dr. Scariano reiterated the need for a neuro-ophthalmologist evaluation to determine if prism glasses might treat the diplopia. He also reported that Mr. Goodman, who previously attempted working in technically skilled positions, had recently quit with a job he had taken "[with Publix] due to ongoing, untreated medical issues." Dr. Scariano considered Mr. Goodman "temporarily totally disabled unless we can [get] appropriate treatment for this patient," and he later testified, "[t]hat means that he can't do any job."

Regarding his inability to work, Mr. Goodman testified that from November 7, 2020, through May 21, 2021, he worked at Publix as a part-time produce clerk for $13.45 per hour. Publix pay statements substantiated his testimony. Mr. Goodman said he worked slowly, made mistakes, and did not handle interruptions by customers well. He resigned because Publix kept reducing his hours, and he could not meet Publix's expectations due to his limitations. Mr. Goodman did not receive any temporary partial disability benefits during that time.[4] After Publix, he did not receive any additional temporary total disability benefits, although he was not working anywhere.

On August 18, 2021, Dr. Scariano placed Mr. Goodman at maximum medical improvement and again adjusted his impairment rating by assessing a seventeen-percent impairment. The rating included a ten-percent impairment for Mr. Goodman's underlying

---

[3] Dr, Scariano testified he based the psychological impairment rating on his review of Dr. Shwartz's report.
[4] BellSouth previously paid periods of temporary disability benefits.

aphasia (a language deficiency) combined with the eleven-percent impairment assessed in January 2021. Dr, Scariano stated he suspected Mr. Goodman's "overall impairment is going to increase moveover [sic] the time" due to BellSouth's failure to authorize his referrals.[5]

During his deposition, Dr. Scariano confirmed that the seventeen-percent impairment was the most appropriate rating for Mr. Goodman's work injury. He also completed a Physician Certification Form stating Mr. Goodman no longer had the ability to perform his pre-injury occupation.

Dr. Scariano additionally testified that Mr. Goodman's symptoms were consistent with electrocution injuries. He confirmed that BellSouth never authorized referrals he felt were necessary to treat Mr. Goodman's work-related injury.

To counter Dr. Scariano's opinion, BellSouth hired Dr. W.G. Strickland, a board-certified neurologist, to perform a records review and testify at the hearing.[6] He concluded that Mr. Goodman retained no permanent impairment or restrictions because the records from the injury date revealed a normal examination with unremarkable imaging studies and did not show "clear evidence of any objective injury."

Dr. Strickland also stated the record did not reflect a loss of consciousness, as Mr. Goodman later reported. He also noted the lack of entry or exit wounds or burns. However, Dr. Strickland admitted it is possible to experience an electrical shock without developing those injuries depending on the severity of the shock.

Dr. Strickland essentially disputed all of Mr. Goodman's symptoms and diagnoses. He testified he expected that any symptoms Mr. Goodman may have suffered to resolve within two to three months after the work injury. Dr. Strickland stated that "[i]njuries of this nature most likely would result in self-limited symptoms that resolve spontaneously over time with or without treatment."

Dr. Strickland also contested Dr. Scariano's impairment rating. He stated that multiple changes in ratings by the same doctor are rare and "atypical" but acknowledged it was not "impossible."

On cross-examination, Dr. Strickland admitted he did not have Mr. Goodman's records from the trauma care hospital despite requesting them. He agreed that "it's better to have all the records" when performing a records review. Dr. Strickland also testified that he did not have any witness reports to counter Mr. Goodman's assertion that he lost

---

[5] Dr. Scariano last saw Mr. Goodman in October 2021 and again referred him to a neuro-ophthalmologist.
[6] Mr. Michael Galloway, a vocational expert, also testified on behalf of BellSouth. The Court finds it unnecessary to summarize his testimony, since the initial compensation period has not yet expired.

4

consciousness. Dr. Strickland confirmed that he based his opinions solely on the records provided to him.

**Findings of Fact and Conclusions of Law**

At a Compensation Hearing, Mr. Goodman must prove by a preponderance of the evidence that he is entitled to benefits. Tenn. Code Ann. § 50-6-239(c)(6) (2022).

*Designation of Authorized Treating Physician*

The Court must first consider whether the presumptions of correctness afforded by the statute regarding impairment and treatment recommendations attach to Dr. Scariano. As noted, Dr. Scariano referred Mr. Goodman to the Shepherd Center. BellSouth argued that Dr. Shwartz at the Shepherd Center "by statute became the treating physician."

BellSouth relied on Tennessee Code Annotated section 50-6-204(a)(3)(E), which states in part that, in cases where the treating physician refers an employee to a specialist, the specialist "shall become the treating physician until treatment by the specialist . . . concludes and the employee has been referred back to the treating physician selected by the employee from the initial panel[.]"

Here, Dr. Scariano, the panel-selected physician, referred Mr. Goodman to the Shepherd Center for neuropsychological testing, not "treatment." Therefore, the Court holds Tennessee Code Annotated section 50-6-204(a)(3)(E) does not apply, and Dr. Scariano remains the authorized treating physician.

*Temporary Disability Benefits*

Next, Mr. Goodman seeks additional temporary partial disability benefits. Mr. Goodman must prove he earned less than his average weekly wage due to work restrictions but had not yet reached maximum recovery. *See* Tenn. Code Ann. § 50-6-207(2)(A); *Frye v. Vincent Printing Co.,* 2016 TN Wrk. Comp. App. Bd. LEXIS 34, at *15-16 (Aug. 2, 2016). BellSouth argued that Dr. Scariano placed Mr. Goodman at maximum medical improvement on May 16, 2019. However, Dr. Scariano testified he later revised Mr. Goodman's maximum medical improvement date to August 18, 2021. Relying on Dr. Scariano's testimony, the Court holds Mr. Goodman reached maximum medical improvement on August 18, 2021.

Here, Mr. Goodman seeks temporary partial disability benefits from November 7, 2020, to May 21, 2021, when he earned less at Publix than his stipulated average weekly wage of $1,337.84. His undisputed testimony is that BellSouth did not have light-duty work available, so he sought work elsewhere. The Court holds Mr. Goodman is entitled to temporary partial disability benefits for the twenty-eight weeks he worked at Publix. Using

Publix's pay statements, the Court holds that BellSouth must pay Mr. Goodman temporary partial disability benefits from November 7, 2020, to May 21, 2021, which equates to $16,498.86. See attached Addendum.

Mr. Goodman also requested additional temporary total disability benefits. He must prove (1) total disability from working as the result of a compensable injury; (2) a causal connection between the injury and the inability to work; and (3) the duration of the period of disability. *Woodard v. Freeman Expositions,* 2021 TN Wrk. Comp. App. Bd. LEXIS 21, at *6-7 (July 16, 2021).

Considering these principles, Dr. Scariano took Mr. Goodman off work on May 24, 2021, and placed him at maximum medical improvement on August 18, 2021. Mr. Goodman testified he did not work during that time. Therefore, the Court holds that BellSouth must pay Mr. Goodman temporary total disability benefits from May 24, 2021, to August 18, 2021, at the stipulated compensation rate of $891.95, which equates to $11,060.18.

*Medical Benefits*

Moving to the referral issue, Tennessee Code Annotated section 50-6-204(a)(3)(H) states that any treatment recommendation or referral by a panel physician is presumed medically necessary. Without any supporting medical proof, BellSouth denied several of Dr. Scariano's referrals because it apparently considered them unrelated to the work injury. However, parties and their lawyers are poorly positioned to formulate expert medical opinions. *See Scott v. Integrity Staffing Solutions,* 2015 TN Wrk. Comp. App. Bd. LEXIS 24, at *8 (Aug. 18, 2015); *Lurz v. Int'l Paper Co.,* 2018 TN Wrk. Comp. App. Bd. LEXIS 8, at *17 (Feb. 14, 2018). Applying the statute, the Court finds Dr. Scariano's referrals are medically necessary and holds that BellSouth shall promptly authorize and schedule the referrals to a speech therapist, psychotherapist, neuro-ophthalmologist, and a work capacity test.[7]

*Permanent Partial Disability*

Tennessee Code Annotated section 50-6-204(k)(7) provides that the treating physician's permanent impairment rating is presumed to be accurate. A party may rebut the presumption by a preponderance of the evidence. BellSouth attempted to rebut Dr. Scariano's impairment rating through Dr. Strickland, who performed a records review.

Considering the evidence, the Court affords Dr. Strickland's testimony little weight because he acknowledged he based his opinions without the requested trauma care hospital

---

[7] Mr. Goodman also requested authorization for the referral for prism glasses. However, Dr. Scariano stated he made the referral to the neuro-ophthalmologist to determine if he needs prism glasses.

6

records and without knowledge as to whether eyewitnesses observed Mr. Goodman's electrocution and loss of consciousness. Therefore, the Court holds that Dr. Scariano's impairment rating is accurate.

BellSouth also argued that, if the Court relied on Dr. Scariano's opinion, Mr. Goodman is only entitled to the three-percent impairment rating Dr. Scariano assigned on May 16, 2019. However, Dr. Scariano explained that he changed Mr. Goodman's impairment rating over time because his condition worsened due to BellSouth's failure to authorize his referrals. He also testified that the seventeen-percent impairment was the most appropriate rating for the work injury. Therefore, the Court holds Mr. Goodman retains a seventeen-percent impairment rating.

The Court next determines the extent of Mr. Goodman's entitlement to permanent partial disability benefits. Tennessee Code Annotated section 50-6-207(3)(A) allows for an original award of permanent partial disability benefits for an employee who sustains a permanent work injury. The award is calculated by multiplying the applicable permanent impairment rating by 450 weeks and then multiplying that number of weeks by the employee's compensation rate. The employee receives this award whether or not he returns to work. After applying the statutory formula, the Court holds that Mr. Goodman is entitled to an original award of permanent disability benefits totaling $68,234.18.

Mr. Goodman also seeks increased benefits and extraordinary relief. By statute, the Court cannot consider Mr. Goodman's entitlement to further permanent disability benefits until February 5, 2023, which is seventy-six and one-half weeks after August 18, 2021, the date of maximum medical improvement. *See* Tenn. Code Ann. § 50-6-207(3)(B). Likewise, the Court cannot consider his entitlement to extraordinary benefits, since he is not yet eligible for increased benefits. *See* Tenn. Code Ann. § 50-6-242(a)(2).

*Motion for Attorney's Fees*

Finally, the Court considers Mr. Goodman's motion for attorney's fees. The Appeals Board previously found BellSouth's appeal of an order to be frivolous and remanded the case to the trial court "to award [Mr. Goodman] attorneys' fees and costs associated with the frivolous appeal." Mr. Goodman's counsel filed an affidavit and presented expert witness testimony. BellSouth filed an untimely objection to the motion, contending the evidentiary record was insufficient for the Court to make the required findings.[8] After considering the evidence, the Court orders BellSouth to pay Mr. Goodman's attorney the requested amount of $ 4,900.00.

Mr. Goodman's attorney filed an affidavit asserting that between June 16-20, 2022,

---

[8] The Order Amending Scheduling Order required BellSouth to respond to Mr. Rufolo's motion and affidavit on or before September 30. Instead, it filed its response on October 3.

he spent a minimum of fourteen hours on the appeal. He reviewed BellSouth's brief, performed research, and prepared and filed his responsive brief. He requested fees at the hourly rate of $350, for a total of $4,900.00.

In his affidavit, counsel addressed the factors required by Rule 1.5 of the Rules of the Supreme Court in assessing attorney's fees. He stated he has over thirty years of experience in the field. He confirmed that the issue required intimate knowledge of the law, and the time spent working on this case precluded him from working on other cases. He stated his normal fee is $350.00 per hour, which is consistent with the customary fees charged in Chattanooga for similar work. Further, he stated the Court previously approved the same hourly fee in another case.

Mr. Goodman's counsel also produced expert testimony from attorney Tony Farmer regarding the reasonableness of his requested fee.[9] Mr. Farmer has forty-seven years of experience in workers' compensation litigation. He corroborated the fee affidavit in all respects, stating that, in his opinion, fourteen hours was a conservative estimate of the time spent on the appeal. He commended counsel's expertise and reputation and confirmed that $350.00 an hour was a reasonable fee for counsel's services.

To determine a reasonable award, the Court shall make specific findings considering the ten factors in Tennessee Supreme Court Rule 8, Rules of Professional Conduct 1.5(a). *See also Wright ex rel. Wright v. Wright*, 337 S.W.3d 166, 169-70 (Tenn. 2011). The ten factors are:

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
(3) the fee customarily charged in the locality for similar legal services;
(4) the amount involved and the results obtained;
(5) the time limitations imposed by the client or by the circumstances;
(6) the nature and length of the professional relationship with the client;
(7) the experience, reputation, and ability of the lawyer or lawyers performing the services;
(8) whether the fee is fixed or contingent;
(9) prior advertisements or statements by the lawyer with respect to the fees the lawyer charges; and
(10) whether the fee agreement is in writing.

---

[9] BellSouth declined to cross-examine Mr. Farmer and then objected to his testimony, which the Court overruled.

Here, Mr. Goodman's attorney testified that he spent fourteen hours successfully bringing the appeal to its conclusion. Workers' compensation appeals require specialized knowledge and familiarity with the Board's rules. The time counsel spent on this appeal precluded him from working on other cases. Mr. Farmer's testimony substantiates counsel's assertion that the appeal required specialized knowledge and experience, especially given the short deadlines in the appeal process. He also supported the reasonableness of the requested hourly rate and the conservative estimated time of fourteen hours. Counsel has substantial experience and is highly regarded within the legal community. These factors all weigh in favor of the requested amount.

Therefore, the Court finds that the evidentiary record is sufficient for the required finings and orders BellSouth to pay Mr. Goodman's attorney fees of $4,900.00.[10]

**IT IS, THEREFORE, ORDERED** as follows:

1. BellSouth shall furnish medical care for Mr. Goodman's injuries as required by Tennessee Code Annotated section 50-6-204, including promptly authorizing and scheduling referrals made by Dr. Scariano to a speech therapist, psychotherapist, neuro-ophthalmologist, and a work capacity test.

2. BellSouth shall pay Mr. Goodman an original award of permanent disability benefits totaling $68,234.18.

3. Payment of past due temporary partial disability benefits shall be made in the amount of $16,498.86 for the period from November 7, 2020, to May 21, 2021.

4. Payment of past-due temporary total disability benefits in the amount of $11,060.18 shall be made for the period from May 24 to August 18, 2021.

5. The Court orders that BellSouth pay Mr. Goodman's attorney fees of $4,900.00 based upon its frivolous appeal.

6. Mr. Goodman's attorney is entitled to a twenty-percent attorney's fee to be paid from his award. Tenn. Code Ann. § 50-6-226(a)(1).

7. BellSouth shall pay the $150.00 filing fee to the Clerk within five business days after this order becomes final under Tennessee Compilation Rules and Regulations 0800-02-21-.06 (February, 2022).

---

[10] Aside from his own fee, Mr. Goodman's attorney asks for consideration of attorney fees for Mr. Farmer's time in driving four hours total to testify on his behalf. Counsel cites no legal authority for this proposition, and the Court rejects it.

8. BellSouth shall file form SD-2 with the Clerk within ten business days of this order becoming final.

9. Unless appealed, this order shall become final in thirty days.

**ENTERED December 20, 2022.**

*Audrey Headrick*

**Judge Audrey A. Headrick**
**Court of Workers' Compensation Claims**

**APPENDIX**

Exhibits:

1. Deposition of Dr. Scariano
2. Publix pay statement details from November 7, 2020, to May 21, 2021
3. Vocational report of Mr.
4. Independent Medical Evaluation of Dr. Strickland
5. Resume of Mr. Goodman
6. List of symptoms prepared by Mr. Goodman

Technical Record:

1. Petition for Benefit Determination
2. Dispute Certification Notice
3. Notice of Substitution of Counsel
4. Notice of Appearance
5. Scheduling Order
6. Motion to Withdraw
7. Agreed Motion to Set Aside Scheduling Order
8. Order Granting Agreed Motion to Set Aside Scheduling Order
9. Order Granting Motion to Withdraw
10. Notice of Appearance (Start on Page 5)
11. Scheduling Order
12. Employer's Motion to Compel Independent Medical Evaluation and to Continue Compensation Hearing
13. Employee Robert Goodman's List of Proposed Exhibits
14. Employee Robert Goodman's List Witness List
15. Employee Robert Goodman's Response to Employer's Motion to Compel IME and to Continue
16. Employer's Reply to Employee's Response to Employer's Motion to Compel IME and to Continue
17. Order Denying Motion
18. Dispute Certification Notice
19. Appeals Board Opinion
20. Order Amending Scheduling Order
21. Motion for Attorney's Fees
22. Employer's Response to Employer's Motion for Attorney Fees and Incorporated

Memorandum of Law

23. Trial Brief of Employee Robert Goodman
24. Employee Robert Goodman's Supplemental Witness List
25. Employee Robert Goodman's Supplemental List of Proposed Exhibits
26. Employer BellSouth Telecommunications' Witness List
27. Employer's Compensation Hearing Brief
28. Employer BellSouth Telecommunications' List of Proposed Exhibits
29. Motion in Limine
30. Employer's Motion for Video Appearance of Employer's Witnesses
31. Employer's Response to Employee's Motion in Limine

# Addendum

*Temporary Partial Disability Benefit Calculations*

Week 1 11/7/2020-11/13/2020 Gross Pay $194.35
$1,337.84-$194.35=$1,143.49 x 66 2/3=**$762.36 TPD**

Week 2 11/14/2020-11/20/2020 Gross Pay $298.19
$1,337.84-$298.14=$1,039.70 x 66 2/3=**$693.17 TPD**

Week 3 11/21/2020-11/27/2020 Gross Pay $339.21
$1,337.84-$339.21=$998.63 x 66 2/3=**$665.79 TPD**

Week 4 11/28/2020-12/4/2020 Gross Pay $497.78
$1,337.84-$497.78=$840.06 x 66/23=**$560.07 TPD**

Week 5 12/5/2020-12/11/2020 Gross Pay $471.56
$1,337.84-$471.56=$866.28 x 66 2/3=**$577.55 TPD**

Week 6 12/12/2020-12/18/2020 Gross Pay $516.61
$1,337.84-$516.61=$821.23 x 66 2.3=**$547.51 TPD**

Week 7 12/19/2020-12/25/2020 Gross Pay $432.15
$1,337.84-$432.15=$905.69 x 66 2/3=**$603.82 TPD**

Week 8 12/26/2020-1/1/2021 Gross Pay $437.26
$1,337.84-$437.26=$900.58 x 66 2/3=**$600.42 TPD**

Week 9 1/2/2021-1/8/2021 Gross Pay $498.59
$1,337.84-$498.59=$839.25 x 66 2/3=**$559.53 TPD**

Week 10 1/9/2021-1/15/2021 Gross Pay $487.43
$1,337.84-$487.43=$850.41 x 66 2/3=**$566.97 TPD**

Week 11 1/16/2021-1/22/2021 Gross Pay $529.80
$1,337.84-$529.80=$808.04 x 66 2/3=**$538.72 TPD**

Week 12 1/23/2021-1/29/2021 Gross Pay $420.72
$1,337.84-$420.72=$917.12 x 66 2/3=**$611.44 TPD**

Week 13 1/30/2021-2/5/2021 Gross Pay $538.20
$1,337.84-$538.20=$799.64 x 66 2/3=**$533.12 TPD**

13

Week 14 2/6/2021-2/12/2021 Gross Pay $638.00
$1,337.84-$638.00=$699.84 x 66 2.3=**$466.58 TPD**

Week 15 2/13/2021-2/19/2021 Gross Pay $528.45
$1,337.84-$528.45=$809.39 x 66 2/3=**$539.62 TPD**

Week 16 2/20/21-2/26/2021 Gross Pay $391.93
$1,337.84-$391.93=$945.91 x 66 2/3=**$630.64 TPD**

Week 17 2/27/2021-3/5/2021 Gross Pay $432.55
$1,337.84-$432.55=$905.29 x 66 2/3=**$603.56 TPD**

Week 18 3/6/2021-3/12/2021 Gross Pay $452.86
$1,337.84-$452.86=$884.98 x 66 2/3=**$590.02 TPD**

Week 19 3/13/2021-3/19/2021 Gross Pay $478.95
$1,337.84-$478.95=$858.89 x 66 2/3=**$572.62 TPD**

Week 20 3/20/2021-3/26/2021 Gross Pay $472.90
$1,337.84-$472.90=$864.94 x 66 2/3=**$576.66 TPD**

Week 21 3/27/2021-4/2/2021 Gross Pay $404.17
$1,337.84-$404.17=$933.67 x 66 2/3=**$622.48 TPD**

Week 22 4/3/2021-4/9/2021 Gross Pay $473.17
$1,337.84-$473.17=$864.67 x 66 2/3=**$576.48 TPD**

Week 23 4/10/2021-4/16/2021 Gross Pay $471.83
$1,337.84-$471.83=$866.01 x 66 2/3=**$577.37 TPD**

Week 24 4/17/2021-4/23/2021 Gross Pay $536.52
$1,337.84-$536.52=$801.32 x 66 2/3=**$534.24 TPD**

Week 25 4/24/2021-4/30/2021 Gross Pay $471.15
$1,337.84-$471.15=$866.69 x 66 2/3=**$577.82 TPD**

Week 26 5/1/2021-5/7/2021 Gross Pay $431.07
$1,337.84-$431.07=$906.77 x 66 2/3=**$604.54 TPD**

Week 27 5/8/2021-5/14/2021 Gross Pay $470.88
$1,337.84-$470.88+866.96 x 66 2/3=**$578.00 TPD**

14

Week 28 5/15/2021-5/21/2021 Gross Pay $396.24
$1,337.84-$396.24=$941.60 x 66 2/3=**$627.76 TPD**

**TOTAL OWED: $16,498.86**

## CERTIFICATE OF SERVICE

I certify that a copy of this Compensation Order was sent as indicated on December 20, 2022.

| Name | Certified Mail | Email | Service sent to: |
|---|---|---|---|
| Jeff Rufolo, Employee's Attorney | | X | jrufolo@summersfirm.com |
| W. Troy Hart, Employer's Attorney | | X | wth@mijs.com |

Penny Shrum, Court Clerk
**WC.CourtClerk@tn.gov**

w/permission)D

For notices of appeal filed on or after July 1, 2022.



Compensation Order Right to Appeal:

If you disagree with this Compensation Order, you may appeal to the Workers' Compensation Appeals Board. To do so, you must:

1. Complete the enclosed form entitled "Notice of Appeal" and file it with the Clerk of the Court of Workers' Compensation Claims *within thirty calendar days* of the date the Compensation Order was filed. When filing the Notice of Appeal, you must serve a copy upon the opposing party (or attorney, if represented).

2. You must pay, via check, money order, or credit card, a **$75.00 filing fee** *within ten calendar days* after filing the Notice of Appeal. Payments can be made in-person at any Bureau office or by U.S. mail, hand-delivery, or other delivery service. In the alternative, you may file an Affidavit of Indigency (form available on the Bureau's website or any Bureau office) seeking a waiver of the filing fee. You must file the fully-completed Affidavit of Indigency *within ten calendar days* of filing the Notice of Appeal. **Failure to timely pay the filing fee or file the Affidavit of Indigency will result in dismissal of your appeal.**

3. You are responsible for ensuring a complete record is presented on appeal. The Court Clerk will prepare the technical record and exhibits for submission to the Appeals Board, and you will receive notice once it has been submitted. If no court reporter was present at the hearing, you may request from the Court Clerk the audio recording of the hearing for a $25.00 fee. A licensed court reporter must prepare a transcript, and you must file it with the Court Clerk *within fifteen calendar days* of filing the Notice of Appeal. Alternatively, you may file a statement of the evidence prepared jointly by both parties *within fifteen calendar days* of filing the Notice of Appeal. The statement of the evidence must convey a complete and accurate account of the testimony presented at the hearing. The Workers' Compensation Judge must approve the statement of the evidence before the record is submitted to the Appeals Board. If the Appeals Board must review testimony or other proof concerning factual matters, the absence of a transcript or statement of the evidence can be a significant obstacle to meaningful appellate review.

4. After the Workers' Compensation Judge approves the record and the Court Clerk transmits it to the Appeals Board, a docketing notice will be sent to the parties. You have *fifteen calendar days* after the date of that notice to file a brief to the Appeals Board. *See the Rules governing the Workers' Compensation Appeals Board on the Bureau's website*

***For self-represented litigants: Help from an Ombudsman is available at 800-332-2667.***

If neither party timely files an appeal with the Appeals Board, the trial court's Order will become final by operation of law thirty calendar days after entry. Tenn. Code Ann. § 50-6-239(c)(7).



## NOTICE OF APPEAL
Tennessee Bureau of Workers' Compensation
www.tn.gov/workforce/injuries-at-work/
wc.courtclerk@tn.gov | 1-800-332-2667

Docket No.: _____

State File No.: _____

Date of Injury: _____

_____

**Employee**

v.

_____

**Employer**

Notice is given that _____

*[List name(s) of all appealing party(ies). Use separate sheet if necessary.]*

appeals the following order(s) of the Tennessee Court of Workers' Compensation Claims to the
Workers' Compensation Appeals Board (check one or more applicable boxes and include the date file-
stamped on the first page of the order(s) being appealed):

☐ Expedited Hearing Order filed on _____  ☐ Motion Order filed on _____

☐ Compensation Order filed on_____  ☐ Other Order filed on_____

issued by Judge _____.

### Statement of the Issues on Appeal

Provide a short and plain statement of the issues on appeal or basis for relief on appeal:

_____

_____

_____

_____

### Parties

**Appellant(s) (Requesting Party):** _____  ☐ Employer ☐ Employee

Address: _____  Phone: _____

Email: _____

Attorney's Name: _____  BPR#: _____

Attorney's Email: _____  Phone: _____

Attorney's Address: _____

*\* Attach an additional sheet for each additional Appellant \**

Employee Name: _____ Docket No.: _____ Date of Inj.: _____

**Appellee(s)** (Opposing Party): _____ ☐ Employer ☐ Employee
Appellee's Address: _____ Phone: _____
Email: _____
Attorney's Name: _____ BPR#: _____
Attorney's Email: _____ Phone: _____
Attorney's Address: _____

*\* Attach an additional sheet for each additional Appellee \**

## CERTIFICATE OF SERVICE

I, _____, certify that I have forwarded a
true and exact copy of this Notice of Appeal by First Class mail, postage prepaid, or in any manner as described
in Tennessee Compilation Rules & Regulations, Chapter 0800-02-21, to all parties and/or their attorneys in this
case on this the _____ day of _____, 20 ____.


_____
*[Signature of appellant or attorney for appellant]*



Tennessee Bureau of Workers' Compensation
220 French Landing Drive, I-B
Nashville, TN 37243-1002
800-332-2667

## AFFIDAVIT OF INDIGENCY

I, _____, having been duly sworn according to law, make oath that because of my poverty, I am unable to bear the costs of this appeal and request that the filing fee to appeal be waived. The following facts support my poverty.

1. Full Name: _____  2. Address: _____

3. Telephone Number: _____  4. Date of Birth: _____

5. Names and Ages of All Dependents:

_____  Relationship: _____

_____  Relationship: _____

_____  Relationship: _____

_____  Relationship: _____

6. I am employed by: _____

My employer's address is: _____

My employer's phone number is: _____

7. My present monthly household income, after federal income and social security taxes are deducted, is:

$ _____

8. I receive or expect to receive money from the following sources:

| | | | |
|---|---|---|---|
| AFDC | $ _____ per month | beginning | _____ |
| SSI | $ _____ per month | beginning | _____ |
| Retirement | $ _____ per month | beginning | _____ |
| Disability | $ _____ per month | beginning | _____ |
| Unemployment | $ _____ per month | beginning | _____ |
| Worker's Comp. | $ _____ per month | beginning | _____ |
| Other | $ _____ per month | beginning | _____ |

LB-1108 (REV 11/15)                                                                 RDA 11082

9. My expenses are:

Rent/House Payment $_____ per month    Medical/Dental $_____ per month

| | | | | |
|---|---|---|---|---|
| Groceries | $_____ per month | Telephone | $_____ per month |
| Electricity | $_____ per month | School Supplies | $_____ per month |
| Water | $_____ per month | Clothing | $_____ per month |
| Gas | $_____ per month | Child Care | $_____ per month |
| Transportation | $_____ per month | Child Support | $_____ per month |
| Car | $_____ per month | | |
| Other | $_____ per month (describe: _____ ) | | |

10. Assets:

| | | | |
|---|---|---|---|
| Automobile | $_____ | (FMV) _____ |
| Checking/Savings Acct. | $_____ | |
| House | $_____ | (FMV) _____ |
| Other | $_____ | Describe: _____ |

11. My debts are:

| Amount Owed | To Whom |
|---|---|
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |

I hereby declare under the penalty of perjury that the foregoing answers are true, correct, and complete and that I am financially unable to pay the costs of this appeal.

_____
APPELLANT

Sworn and subscribed before me, a notary public, this

_____ day of _____, 20_____.

_____
NOTARY PUBLIC

My Commission Expires:_____